This is number 22-10072, Banks v. Secretary, Department of Health and Human Services. We've got Mr. Pistorino here for the appellant and Mr. Saxon here for the appellee. Mr. Pistorino, it looks like you've reserved four minutes for rebuttal. That's correct, Your Honor. Very well. Proceed when you're ready. May it please the Court. James Pistorino on behalf of Mr. Banks. In TransUnion and Spokeo, the Supreme Court told us that the central inquiry here, particularly on injury, is to identify at the outset whether or not the harm alleged bears a, quote, close relationship to a harm traditionally recognized as one providing a basis for a standing or suit in an American court. Clearly one iconic basis would be breach of contract. At its heart, at base, this case is about breach of an insurance contract. Mr. Banks paid actually 3 percent of his salary for his entire working life and then voluntarily paid additional premiums in entering into an insurance contract with the secretary. In exchange for the premiums from Mr. Banks, the secretary was required to pay for all qualifying claims. The claim qualifies. In exchange for the premiums, the secretary has to pay for it. In this case, taking the allegations of the complaint as true as the court must at this stage. Again, the complaint alleges that the item at issue in here, TTFT treatment, was a covered benefit. Again, as ALJ Golan had found in the prior matter. It was a covered benefit and complained that the failure to provide coverage on Judge Kelton's decision, the one at issue here, lacked substantial evidence and was arbitrary and capricious. Just taking those things right there, Mr. Banks has been injured in that he paid the premiums and the contract was not honored by the secretary. Just so I'm clear, he paid the premiums and didn't pay for the treatment, right? I mean, he got the treatment for free. It's correct that Novacure, that he was not charged for, but the contract, pursuant to the statute, the contract is that Medicare is to pay either Mr. Banks or someone else on his behalf. It's not that he gets the treatment. It's that the contract, again, the statute says he's entitled to have payment made to him or on his behalf. I guess the reason I'm asking is because you led with Spokio and TransUnion, you know, I guess I'm kind of out of the closet as a dissenter on Spokio and TransUnion, but they are what they are. And so, you know, I mean, Spokio and TransUnion both seem to say statutory violation alone is not enough. You've got to show us something else. And it seems the something else, the obvious something else here might be out-of-pocket injury, but I'm not sure there is an out-of-pocket injury for your client. Right. So I agree with you in terms of, you know, they are what they are. But again, as opposed to just a straight violation of a sub-statutory right, which I'm sure you know is one of our other bases, this is a little bit unusual because in this instance, the government is really just running up just a typical standard insurance program. It could be State Farm on the other side of here. When the insurance pay the premiums, there's a contract established and there are obligations on the other side. The obligations that the Secretary took on was to pay for qualifying claims. Not that Mr. Banks gets some treatment from somebody else somehow. It's that the Secretary would pay for the qualifying claims. That's the contract. But so in that respect, are you really advocating on behalf of Dovacure? No, I'm advocating on behalf of Mr. Banks. But I mean, they're the only ones out-of-pocket, right? Well, except for the premiums that Mr. Banks paid, right? But he got, I mean, why didn't he get the benefit of that bargain when he got the treatment? I guess I'm just not really understanding. Well, again, because the statute says and the contract is that Medicare will pay. Medicare will pay or pay him or pay somebody else on his behalf. And that's the part that the Secretary has refused to do. So again, I know one thing I always just come back is real quick, just practically, if this case is not reversed, next time Dr. Banks goes to get the treatment, right? His supplier will have not been paid the time before and he'll be in the doctor's office saying, I need this treatment for my brain cancer. And they'll be sitting there saying, you're presenting your worthless insurance again, right? Because the last time we gave you the credit, we didn't get paid. Nobody's going to let, nobody's going to give him the treatment at $20,000 a month without some way of getting paid at that point, right? And it's not from, not from the Medicare contract that Dr. Banks, Mr. Banks entered into because they already went that route one time before. So right there in the doctor's office, he's going to need to come up with $20,000 or he's not going to get the treatment. And that's, again, that's the whole, whole part of the harm here. Just really, really practically. That's why he's got the insurance. Well, didn't he discontinue use of the treatment and has that resumed? Dr. Mr. Banks, I keep on wanting to call him doctor because he has a PhD, but Mr. Banks has not resumed the treatment. But again, that's on advice and working with his doctor because he develops an allergy. But unfortunately the brain cancer, former brain cancer, he has GVM, there's no cure for it. And the only treatment that available is the treatment we're talking about here. And so just sadly, because this form of cancer will always progress, at the end of the day, you're always going to need this treatment. You'll always need this treatment. So again- Let me ask you a follow-up to Judge Middlebrooks' question. It seems to me, speaking just for myself, that the strongest argument you have is certainly not the statutory one. It's been rejected by our court. And I don't think the coverage denial argument has legs. The best argument, speaking for myself, that you have is the future risk argument. You claim the risk is imminent or it has to be imminent. That's certainly the buzzword that the Supreme Court uses, actual or imminent. With regard to the TTFT treatment, as I understand it from the record, Mr. Banks went off that treatment voluntarily in 2018 due to an allergy to the gel involved in the treatment. Is there any record evidence that he went back? We're now four years later. Is there anything in the district court or anything that has been supplemented in the record that would suggest over the past four years he's actually gone back, resumed using TTFT? I think he actually took the break because of the allergy in 2019 as opposed to 2018. But it's true, as I just said before, he has not gone back on it because of the allergy in working with his doctor. In working with his doctor, he has not gone back on it. But again, as I said, because there's no cure and the disease progresses and the whole idea of TTFT is to help slow progression. So because of that, he's ultimately going to need the treatment. I think the essence of your argument is, given the virulent nature of this cancer, he will have to go back. Correct. My question is a when question against the backdrop of being off since 18 or 19. Do we have any idea or do we have to essentially speculate when he will seek that treatment again? Because until he does, there's no injury and it could not actuate until A, he seeks the treatment, B, he gets the treatment, C, they refuse payment at every level. So a series of events have to occur. And I'm just trying to calculate this imponderable risk because the law requires us to ask whether the injury is imminent. So help me with how we find imminence since he's been off for three or four years and there's no indication when he will go back, although I think it's clear at some indeterminate period, he will have to go back. Why is that imminent? So there's a lot of points that let me try to hit them all. I actually, at least as I understand the test, particularly from Department of Commerce, the test is because I think the actual or imminent necessarily phrase that way might be from Clapper, but at least from Department of Commerce and the Supreme Court, the test is really substantial risk of future harm. I think that's the phrasing that they're using. So I think in terms, I guess the way I've always thought about it is I think it depends a little bit on a perception, right? Again as we saw from the decision from Judge Holt, if the decision here is not reversed, he will lose the right to what we're calling the Medicare mulligan. He will lose that and be subject to ultimately be personally financially liable, again in the Holt case it was $60,000, here it would actually be $60,000 because it's three months at issue. So if the decision here is not reversed, he will lose the mulligan and be subject to the financial liability. And so I know what we've been saying is, for example, we cited the court, the Jane case, right? The time to fight that is now, right? If it's not reversed now, that's the loss that he will, the risk, the liability that he will face in the future. Help me with that. Does he have to sign an advance beneficiary notice holding him liable first before he could be tagged with the expense? No, no. And that's exactly what happened in the Holt case. The beneficiary there suffered from the same brain cancer as Mr. Banks here. He had a prior denial, the beneficiary in the Holt case had a prior denial. He came back again, of course needed the treatment, sought the treatment again, and as the decision in the Holt case said, in the absence of an AVN, because both the beneficiary and the supplier knew or should have known of the prior denial, the beneficiary was held liable. So in the Holt case, the beneficiary was held personally liable for the $60,000. And what I was trying to go to, again, a lot of the ways I think about it, it depends upon what your perception of that. Is the loss of the mulligan, is that a present loss? So for example, if today I say, you lost your right to vote, did you suffer that loss today or do you only lose it at the next election? When did you suffer the harm? Well, I think one difficulty is, in the analogy that Judge Marcus is getting at, is that there is this sort of chain, arguably like a chain of speculation that requires you to get from the arguable loss now to the injury then, right? I mean, like you would have to, you know, sort of the condition would need to worsen, A. B, you would need to seek the treatment, C, you would need to have the treatment prescribed. We don't really know sort of what the state of the art might be in 6, 9, 12, 18 months. You know, D, you'd have to be refused, E, maybe the ABN has to be signed under your reading Holt, maybe it doesn't, E, F, wherever we are, maybe there would have to be a denial. It just seems like there's a lot that would have to happen in order for the injury to manifest. So in terms of the denial, if I just go to that real quick, again, I know there's been a lot of discussion about the revised LCD. And I think at this point it's actually admitted. Under the revised LCD, the claim will be denied. Mr. Banks was considered what they call recurrent, and therefore under the LCD, his claim will certainly be denied, right? So really the only question is, again, at some point, because this disease is a progressive disease, at some point he will need the treatment. And so the whole thing is, right, at that moment, you know, his claim will be denied as it must be under the LCD. And again, as the... Let me ask you a question about that. Just help me understand the procedure. The new LCD provides that Medicare coverage is appropriate for individuals with newly diagnosed GBM. And we know that your client was not newly diagnosed. But isn't the LCD only entitled to persuasive weight? Or are the decision makers obligated by law to follow it? So unfortunately, again, there's a five-level review process in Medicare. I think I'm over my time, but there's a five-level review process in Medicare, at the first three levels of which... So when he wants to go... You know, the first time the claim gets submitted, called initial determination, it will be denied. They are required to deny the claim. There's a next level of appeal called redetermination. They are required to deny the claim. There's the next level called the independent review entity or the qualified independent... See, the reason I raise it is I thought under the CFR 4051062A, the decision makers at some level could reject the LCD and actually decide to cover his treatment as already had occurred. Is that not true? Could they... Are they obliged to accept the new LCD, which I agree would seem to preclude your client? And they say, yeah, but we now know TTFT is the best treatment going for a horrible disease and it works. It provides life for a period of time. And we're not following LCD, the new LCD. Would they be within their legal rights at the appellate review level administratively to do that? So the short answer to your question is yes. Again, at the ALJ level and at the Medicare Appeals Council level, they would have discretion to depart from it. But again, I think if you go back to the two decisions that are at subject here, right, we've got one decision from ALJ Golan, for example, finding that it is covered, right? Now just going to sort of the risk. But we've got a completely contrary decision from ALJ Kelton going the other way, right? And in order to overcome the discretion, of course, is not without limit, right? They've got to explain why, why they're not doing it and that kind of thing. So again, he would still bear the burden of trying to flip them in the face of the LCD. So your starting point is, you know, it's going to be denied at the first two slash three levels, right? And unless you come up with something unusual or different, it will be denied at the third level because of the revised LCD. And again, in this case, just like, for example, Judge Kelton did. And of course, as you know, the underlying thing of all of this is the basic argument, of course, is collateral estoppel, right, is that he, one, was from ALJ Golan finding that it was covered, finding that it was covered, and the secretary should be estopped. The whole thing that got us here, the secretary should be estopped from denying it. So again, it just comes back to, again, the future denial on Mr. Banks' behalf. We would be contending they would be estopped from doing that. But again, the LCD, because the LCD, it's flipping the burden on us, and I'm way over my time. Very well. Thank you so much. You'll have your full four minutes of rebuttal. Mr. Saxon, let's hear from you. May it please the court, Jay Saxon from the United States Attorney's Office for the Northern District of Alabama on behalf of the secretary. Plaintiff Banks does not have standing because he has suffered no injury in fact that is redressable by a favorable judicial decision. This conclusion comports with those of every circuit court of appeal to have taken up this issue as well as eight federal district courts, all of which found that plaintiffs under nearly identical circumstances to those present here lacked standing to bring those actions. Judge Newsom's well-documented reservations notwithstanding, the Spokeo case does require that to show standing, a plaintiff must suffer an injury in fact fairly traceable to the conduct of the defendant that is redressable by a favorable judicial decision. And Mr. Banks' standing fails on both the first and third prongs of that analysis. First, he suffered no injury in fact because he has not and has adduced no evidence that he will ever have to pay for the treatment that he has received. He sought those treatments. They were paid for by Novacure and he will never have to pay for them. He can't be billed for those treatments by Novacure because not only has he not received an advance beneficiary notice indicating that coverage will be denied, but he has also not signed an advance agreement to pay in the event coverage is denied. Without both of those things, Novacure cannot bill Banks for the treatments that they have paid for and so Banks will never have to pay for the three treatments that are at issue in this appeal here. Isn't there a substantial risk that harm will occur? He's got incurable cancer and it's likely to come back. So why is that not a substantial risk that the harm will occur? Well Judge, that was my next point. That would go to the risk of imminent injury. And Banks has no imminent injury here because to be imminent an injury must be certainly impending. Those are the Supreme Court's words in Clapper. As was discussed, Mr. Banks is not receiving the TTFT treatment and he has indicated no intention to resume treatment in the near future. So whether or not he even receives additional treatment is entirely speculative. But he said that he would, that it would resume if his cancer were to, I guess, reoccur or that may not be the right word and it's almost certainly likely to do that. So why is that not a substantial risk of harm? Particularly, and as I understand it, you may have conceded this, that the new LCD doesn't apply to his disease. And could you take both those issues? Yes, Judge. First of all, even if Dr. Banks were to receive new TTFT treatment tomorrow, there are at least 14 separate things that would have to happen before he would be able to establish standing. I won't name each 14 in turn, but he would have to go through the entire appeals process, have his claims denied at every single level. Then he would also have had to receive an advance beneficiary notice indicating a risk of non-coverage. And he would have had to sign an agreement not to pay, neither of which he has done. Only once all of those things had happened would he be able to establish any kind of actual or imminent injury. And other cases that have looked at a possibility of imminent harm have found that even three or four steps down the chain is too attenuated a chain of possibilities to establish standing. So three or four steps is not enough. Certainly 14 steps is way too many. As to what the new LCD means, it's not actually accurate. Before you go on to that, I just wanted to dwell further on what Judge Middlebrooks was asking, if I could. Imminence of harm. It seems pretty clear that the disease is inexorable and it will come back. No one disputes that, Your Honor. So the only question is when, but when it comes back, it will be very virulent. We can all agree on that, right? Yes, Your Honor. So the only indeterminate question is when it happens, right? Yes, Your Honor. And when it comes back, the only treatment out there apparently is TTFT, right? I'm not a doctor, Your Honor, but as far as I know. On this record, that seems to be the most promising treatment and he's been on it for some time and then went off in 18. So we know with virtual certitude it will come back. And when it does, he will need more treatment. So that's not substantial. That's overwhelmingly likely to happen. The only question is the temporal one of when. Is that what you hang your hat on? That we do not know when it will happen and that is what denudes it of its imminency? Well, Judge, I would actually take issue with your hypothetical because there is no absolute guarantee that his illness will come back. Again, even to assume it will is speculative. If he's been stable, I thought the best record evidence out there was. That glial blastomas are inexorable. They come back. We know that to a very, very high degree of confidence. Maybe there's an exception, but it's overwhelmingly likely that would be a fair statement from this record, wouldn't it? Yes, Judge. OK, so we know it's going to come back for our purposes. And we know at that point he's going to need a treatment. And we know from this record that the best treatment out there is TTFT. So why isn't that enough to make the risk substantial? The only thing it seems to me you can argue is it's insubstantial, Judge, because it's indeterminate. And he's already been three or four years without it. For all we know, we'll go another three or four years without it. And six years down the road is not whatever it is, it isn't imminent. That's the heart of your argument. Not exactly, Judge, because one of the things that the appellant has argued is that they will absolutely be denied this coverage if they seek it again. And that is simply not accurate. First of all, the 2019 LCD updated the 2014 LCD and now provides for coverage. But I will concede that the record indicates that Mr. Banks has recurrent glioblastoma. However, to say that he will absolutely be denied under the 2019 LCD is not accurate. As in this case... Doesn't that preclude recurrent disease? It does, Judge. However, in this case, under the 2014 LCD, TTFT treatments were not covered. And yet ALJ Gulen went against the LCD and found that the treatments that Mr. Banks received would be covered. And so under the new LCD, an ALJ is perfectly within his rights to go against that LCD and say that treatments for recurrent GBM will be covered, which is exactly what's already happened in this case. So that's why I said it's not accurate to say that it's a guarantee that he'll be denied coverage. All the ALJ has an obligation to do if he goes against the 2019 LCD is to indicate his reasons for doing so. And in the proceedings below, this may be helpful for the court, there were two separate proceedings before two ALJs, which everyone knows. The ALJ Gulen, the ALJ who found coverage, he had more and better evidence presented to him of the efficacy of the TTFT treatment. So there's every reason to believe that if Dr. Banks were to have to go through this appeals process again, he could submit this new and better evidence as to why his treatment should be covered. And it's perfectly plausible that an ALJ would go against the LCD, as has already happened in this case, and find coverage. Would that decision be preclusive? No, Your Honor, it would not be preclusive because the statutory scheme of Medicare envisions having repeated claims for separate and different kinds of treatments. So there's no preclusive effect that that treatment would have. And in fact, if the ALJ did go against the LCD, then the statute specifically provides that when an ALJ goes against an LCD, that standing is not precedential and applies only to the beneficiary in that circumstance. But hadn't the Supreme Court said that in order to avoid preclusive effect, a statute must speak directly to the issue? And the Medicare statute doesn't seem to speak directly to it, does it? Respectfully, Your Honor, the Supreme Court has also said that you must look at the statutory scheme as a whole. And there does not have to be, and these weren't the Supreme Court's words, just for the sake of brevity, there doesn't have to be any magic language to the effect of collateral estoppel does not apply. If you look at the statutory scheme as a whole, then a court must determine whether or not preclusion would comport with that statutory scheme. Well, what can you point to, I guess the regulation in part, but the statute doesn't really contain anything that would preclude it, does it? Your Honor, there's nothing specific. But there are three reasons why collateral estoppel is incompatible with congressional intent with respect to the Medicare statute. The Medicare program as enacted by Congress forecloses the use of collateral estoppel for three reasons. First, there's the fact that the ALJ's review is only an indeterminate step, excuse me, an intermediate step in the administrative review process. Second is the fact that the Secretary is allowed to resolve claim appeals through individual adjudications. And third, there's a requirement that benefits be presented and channeled through administrative review. First of all, if a decision were to have preclusive effect at the ALJ level, that would vitiate the meaning of the Medicare statute which provides for de novo review by the Medical Appeals Council. If whatever one ALJ decided meant that no other ALJ in the future could decide anything else, then the Medicare Appeals Council wouldn't be able to provide de novo review. All it could do is rubber stamp whatever the ALJ had decided. So right then and there, the Medicare statute has been violated insofar as the MAC can't do its job. The Secretary is also allowed to resolve claims through individual adjudications. In this regard, the Medicare statute envisions that conditions are not static, that they  If an individual condition changes, it stands to reason that individual would want to be able to come back before Medicare and seek coverage for any new or different treatment based on those changes in circumstances. That's why the Medicare appeals process envisions individual adjudications of separate claims. And if we had a preclusive effect from an ALJ decision, there would be no individual decisions. They would be predetermined, which is not proper under the Medicare statute. Let me ask you a fact question. From this record, can we tell when Mr. Banks went off the TTFT treatment voluntarily? The date? It may be in the record, Your Honor, but I have not seen it, a specific date as to when he went off the treatment. All I know is that he has not submitted any new claims for treatment since 2019. Has he been given and has he signed an advance beneficiary notice at any point in this process? If I may clarify, Your Honor, the advance beneficiary notice is only a notice from the supplier that coverage is likely to be denied. It is not a thing that Mr. Banks would sign. What Your Honor is referencing is in addition to an advance beneficiary notice, he must also sign a document which says that he will pay in the instance of non-coverage. I believe that's what Your Honor is referring to. He has not received either of those. He's received no advance beneficiary notice and he has not signed an agreement to pay. If he were to, if we were to rule that he has no standing at this point and the disease was to recur and he were to seek TTFT treatment and his doctor, his neurologist were to say he needs this, would he have standing at that point or would he have to wait until he had been denied at the five levels? He would have to go through the Medicare appeals process. That's the way the process is. How long would that take? I can't speak to that. You understand why I asked the question. I certainly do, Your Honor, yes. And that may, I understand your preposition that that's essentially an unfortunate state of affairs. And I don't disagree with you that it may be unfortunate, but that is the way that the Medicare claims and process and the statute is designed. He must go through the process. He might be put to the choice of saying, give me the treatment and if I have to pay, I will. Or I'm not going to take the treatment in the hope that I will eventually win it before the five levels. Well, he would not be able to be billed for that treatment because there's been no A, B, and an agreement to pay. So as far as I understand it, Dr. Banks wouldn't be able to say, wouldn't be in a situation where he'd have to say, I'm going to take the treatment knowing that I have to pay because he's never signed any of those agreements. So he cannot, as a matter of law, be billed by Novacure for this treatment unless and until he receives an ABN and he signs that agreement to pay. The difficulty, I guess, as your adversary says, is that Novacure next go around is going to be like, no, we didn't get paid for this last time. We're not doing it this time. And Your Honor, if they provide him with an ABN, an advance notice to pay, then he is in a position where he may be financially liable. But until, unless and until those things happen, there is no way he could establish any standing. And even then, we would argue his injury is not imminent because he still would have to go through the appeals process and he would have to be denied at every level. And as we've seen, an ALJ would be perfectly within his rights to disregard the 2019 LCD and find coverage for Dr. Banks, as happened in this case with the 2014 LCD. If there is nothing further, then I yield the remainder of my time. Thank you. Okay, very well. Thank you so much. Mr. Pistorino, you've got four minutes remaining. Thank you very much, Your Honor. And actually, I want to go straight to your questions, Judge Marcus, because I actually think they go straight to our point. I saw you nodding along. I didn't do my best to bestow it, but I think they go straight to our point, actually. And I actually thought much of the exchange there, in my view, actually went straight to our point. As I understood it, it was undisputed that the disease is incurable. It is undisputed that he will have recurrence. There is no cure. Again, I know the statistics say, in fact, it's positively a miracle, we would contend as a result of TFT, that Mr. Banks is still with us today. So there's no cure. The only question is progression. How fast or slow is the progression? At some point, you've got to go back and treat it, regardless of your allergy. So in terms of is there a substantial risk of future harm, yes, he's going to need the treatment again. And I thought the questions that I heard right at the end go right to our issue. You're at the doctor's office. Last time you came, they didn't get paid the $60,000. What I've heard from him is, I'm sorry, what I've heard from my able opponent is, you're standing there, you need the treatment, and he's saying, great, you can submit a claim for that. And I heard a question, how long is the appeal process, five years? If you follow the minimum standards for the statute, it's 360 days. So you could go to the doctor's office, just if you had a heart attack, you're in the ER. Guess what? We're not going to treat you now, because we didn't get paid last time. But in 360 days, maybe you'll get treated. Obviously, that's the whole idea of the insurance, is that you're not going to get treated. Wouldn't he have standing just as soon as the provider said, no? I'm trying to make sure I'm following your hypothetical. Is the hypothetical that he's there in the doctor's office, and at that moment, he files a federal lawsuit? The doctor says, yes, he should get TTFT, he should get it now. He sends a script to the carrier. The carrier says, we weren't paid then. Until you promise to pay us now, we're not going to do it. At that point, couldn't you come right into federal court, establish standing, and the imminence would be clear? Wouldn't it be really actuated at that point? I think at that point, again, as you go through the Supreme Court cases under 405G, the first thing you have to do is present a claim to Medicare, the presentment requirement, right? You first have to present. So it can't just get the thing from his provider saying, no, he's got to first submit a claim to Medicare. Medicare would have to respond, reject the claim, right? Then under traditional- At the very first rejection. Right. 60 days. You walk into federal court and you say, time is of the essence. This is an emergency situation. My guy's got standing, let's go to the merits. Why wouldn't that be a good claim? And why wouldn't that solve or at least ameliorate the thrust of the problem? So if I could, I'm just trying to follow hypothetical and very quickly. I think at the end of the day, what you're thinking is, well, maybe he could mitigate the harm in the future if when he gets denied there, because the insurance contract here wasn't honored just like the secretary agreed to, because it wasn't, he could immediately file a claim. Then after 60 days, he's going to file a suit in federal court, right? Under the statute, the secretary gets 60 days to respond. That's another 60 days, right? And then typically, of course, the first thing that happens- And you suppose the judge would not be able to bring that thing to a head very quickly? No, I think a judge could, but again, what you're talking about- Has happened, I can assure you. And the court has brought in health and human services far before 60 days and brought in the parties and said, this is real, this is immediate. What about it? Well, we got 60 days and I say not in this courtroom and not now. I would be in my power to do that, wouldn't I? It certainly would be within your power, but if I can, I think what you're referring to is mitigating the harm that he's suffered now. You're saying if right now, he loses his insurance, the secretary doesn't honor the contract, when he's faced with that choice of putting up the money or not getting the treatment, your honor's hypothesizing that if after he waits 60 days or so, because he got to present the claim, that then he could file the lawsuit and hire the attorneys for the third time around to try to get the coverage that the secretary agreed to provide in payment for the premiums that we're fighting about here. So I think the hypothetical is just that the harm that he's certainly suffering right now, again, Jane, when today, where he's going to face that, your honor's, I think, hypothetical is that it will be mitigated, will be mitigated by these other efforts. Potentially he could deal with it, potentially if he got a judge to take it up very quickly. Let me ask you one quick question. Can you tell me where in the record I can find the answer to the question I asked your colleague, which is when he went off TTFT? I think if your honor was, I think if your honor was to look at the transcript of the hearing below on the question of standing, I think I represented there that it was 2000 and sometime in 2019. That's my, that's my information from, from Mr. Banks. So it's in the transcript of the hearing below, uh, where that was, when that was stated, if I I'm over my time, but if I could, I would say judge Middlebrooks has a question. If you went on standing, but lose on preclusive effect, where, where do, where are you? Well, I, again, it's sort of the way we, the way we, um, litigated below the pleadings below then I think the case will be over because we, even though we certainly could prove the merits of whether or not TTFT itself is safe and effective. And again, I know the papers say, uh, an ethical trial was stopped because it would be unethical to withhold people. But under the procedure at the district court, we needed to come forward with all the base on what you wanted to, uh, prevail. We wanted to prevail on collateral estoppel. He hired attorneys the first time he won, I'd heard the thing about the DeNovo review. And I know I had a note here from BNB hardware, the Supreme court case going to exactly that thing. The fact that the ALJ's decision would have been able to be reviewed on DeNovo doesn't mean it can't have preclusive effect. If the secretary had appealed ALJ Gulen's decision will be something else, but they didn't. They didn't. You got a final judgment and just traditional collateral estoppel, a final judgment. They didn't appeal. We got the exact same issues, the exact same facts coming back for the second time. They should be precluded just like any other party would be. Thank you, your honors. Very well. Thank you so much to both sides. Um, that case is submitted. We'll move on to the.